IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2014

**STATE OF TENNESSEE v. JUSTIN WILLIAM VOTO**

**Appeal from the Criminal Court for Knox County**
**No. 89776     Bob R. McGee, Judge**

_____

**No. E2013-02652-CCA-R3-CD - Filed November 24, 2014**

_____

In 2008, the Defendant, Justin William Voto, pleaded guilty to kidnapping and was granted judicial diversion for a period of ten years. In 2013, the Defendant's supervising officer filed a warrant to revoke his judicial diversion based upon new charges. At subsequent hearings, the trial court revoked the Defendant's judicial diversion, entered a judgment of conviction, and sentenced him to ten years of supervised probation. The Defendant filed a notice of appeal. While the appeal was pending, the Defendant's probation officer filed a warrant to revoke his probation based upon the Defendant's failure to follow probation requirements, and the trial court revoked the Defendant's probation sentence and ordered him to serve his sentence in confinement. In this consolidated appeal, the Defendant asserts that the trial court erred when it revoked his judicial diversion and his probation sentence. The Defendant also asserts that the trial court's imposition of a ten-year sentence was improper because the proper range in this case is three to six years. After a thorough review of the record and applicable law, we affirm the trial court's judgment revoking the Defendant's judicial diversion, vacate the ten-year sentence imposed, and remand for a sentencing hearing.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in part and Reversed in part; Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Stephen Ross Johnson, Knoxville, Tennessee, for the appellant, Justin William Voto.

Herbert H. Slatery, III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Randall Nichols, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Background and Facts**

On August 8, 2008, pursuant to a plea agreement, the Defendant agreed to plead guilty to kidnapping, a Class C felony, outside the range, as a Range II offender with the trial court to determine his sentence. The State agreed "not to oppose probation and judicial diversion if [the Defendant] complete[d] [a] course of treatment recommended [by a mental health facility]." On November 6, 2008, the trial court granted the Defendant's request for judicial diversion and placed him on judicial diversion for a period of ten years.

On January 8, 2013, the Defendant's supervising officer filed an affidavit alleging that the Defendant had violated condition (14) of his judicial diversion by incurring criminal charges for assault, public intoxication, and aggravated assault. On March 1, 2013, the Defendant admitted to a violation of the terms of his judicial diversion and requested that the trial court "reinstate" his judicial diversion; the Defendant waived his right to a hearing on the matter. The trial court subsequently scheduled a sentencing hearing, which was held on April 12, 2013.

At the hearing, the following evidence was presented: Megan Glenn testified that she had dated the Defendant "a couple of years back" for about a year or a year and a half. She stated that, during the time she was dating the Defendant, he told her he was "on probation" for "cutting somebody's lips off and slitting somebody's eyelids," but Ms. Glenn did not know if that had actually occurred. Ms. Glenn stated that, during the time they dated, the Defendant exhibited "violent behavior" when they were "playing." She recalled that he choked her, and she told him to stop when it was not "funny anymore," and she "blacked out." Ms. Glenn said she was crying when she asked the Defendant why he did not stop choking her when she could not breathe.

Ms. Glenn recalled that the Defendant would say things that "threw [her] off" such as talking about hurting his mother "in a moment of anger[.]" Ms. Glenn also stated that the Defendant threatened her family, and threatened the family of a woman named "Dana." Ms. Glenn explained that the Defendant was charged with assault on Dana Shell and her father, and the Defendant subsequently told Ms. Glenn that he would "blow up their house" and made other "crazy off-the-wall statements," which she did not perceive to be jokes.

Ms. Glenn stated that she was present when the assaults on Ms. Shell and her father occurred, which lead to the Defendant's judicial diversion revocation. Ms. Glenn stated that she, the Defendant, and Ms. Shell were driving in Ms. Glenn's car, with the Defendant in the passenger seat and Ms. Shell in the backseat. Ms. Glenn stated that the Defendant and Ms. Shell got into an argument in the car, and he turned around and "choked [Ms. Shell] in the

back of [Ms. Glenn's] car[,]" "cutting off her airway." Ms. Glenn stated that she pulled her car over to the side of the road, opened the back door, and pulled Ms. Shell out of the car. She told Ms. Shell to run home because they were relatively close to Ms. Shell's house. Ms. Glenn testified that Ms. Shell's father approached the car, and the Defendant got out of the car and pushed him down to the ground. Ms. Glenn stated that the Defendant had been drinking vodka that night, but she did not know if he was intoxicated.

On cross-examination, Ms. Glenn agreed that she had been drinking the night of the assault on Ms. Shell and her father, as had Ms. Shell. She agreed that she saw Ms. Shell's father was "com[ing] toward" the Defendant and then saw the Defendant push him to the ground. Ms. Glenn stated that she was aware that the Defendant was on Adderall medication for Attention Deficit Disorder.

Dana Shell testified that she was a friend of Ms. Glenn's. She testified that on the night of November 18, 2011, she and Ms. Glenn picked up the Defendant. He sat in the front passenger seat, and Ms. Shell sat in the backseat. Ms. Shell recalled that she and the Defendant started arguing, and "it just kept escalating." The Defendant "snapped" and started yelling at Ms. Shell, asking her if she wanted him to hit her. Ms. Shell recalled "that's when he turned around and held me up against the back seat and was choking me and - the point where I couldn't breathe, I couldn't scream for help or get [Ms. Glenn] to help me . . ., and finally [Ms. Glenn] realized what was happening and she opened the back of the car and had to pull me out." Ms. Shell stated she had red marks on her face and neck from the Defendant choking her. A photograph of her injuries was admitted as evidence into the record.

Ms. Shell testified that, after the Defendant choked her, she went to her house, and her father came outside. Ms. Shell said that her mother had called the police at this point. Ms. Shell said her father was looking for the Defendant. When he approached him, the Defendant pushed him, and he tripped on the curb and fell down on the ground. Ms. Shell stated that the police arrived and placed the Defendant under arrest. She recalled that the Defendant had been drinking, and she stated that he was later charged with public intoxication.

On cross-examination, Ms. Shell agreed that she had also been drinking that night. She stated that Ms. Glenn and the Defendant were not dating at the time, but "she missed him[]" and "still wanted to see him[.]" Ms. Shell stated that she and the Defendant argued over whether she would leave Ms. Glenn and the Defendant alone. She denied hitting or kicking the Defendant. Ms. Shell stated that her mention of the Defendant hitting Ms. Glenn made him snap. He turned around toward the back seat of the car and said, "do you want me to hit you[?]" and then proceeded to reach into the back seat and choke Ms. Shell.

Ms. Shell said she ran inside her house and told her mother and father what had happened. That is when her mother called the police and her father went outside.

Further exhibits admitted into evidence were judgment forms showing that the Defendant had pleaded guilty to the public intoxication and assault charges that arose from the incident between him and Ms. Shell and her father. Also admitted was a presentence report, medical records from the Defendant's stay at Ridgeview Institute, monthly reporting forms provided by the Defendant's judicial diversion supervisor, numerous letters written in support of the Defendant, his school records, a college acceptance letter, and a letter from a psychologist.

At the conclusion of the hearing, the trial court took the matter under advisement. A subsequent hearing was held on August 1, 2013, during which the trial court considered the Defendant's request to remain on judicial diversion. The trial court denied the Defendant's request, stating that it had considered his "weak amenability to correction" and particularly the fact that the Defendant was originally placed on judicial diversion for assaulting a woman and then violated the conditions of judicial diversion by committing a second assault on another woman. The trial court stated that judicial diversion had been "tried" and did not work for the Defendant. The trial court noted that the Defendant had mental health problems that he was addressing while on judicial diversion but stated that judicial diversion "wasn't sufficient" to help him address those problems. The trial court further noted that it had considered the deterrence value of the Defendant remaining on judicial diversion and whether the same would serve the interest of the public as well as the Defendant. Because the Defendant had committed "dangerous offenses," the trial court found that it would not be in the public's best interest for him to remain on judicial diversion.

As to the sentence the trial court would impose, it made the following statement:

> We've had a series of hearings about what sentence can be imposed in this situation. There are cases that indicate that the original plea does not survive the revocation of the [judicial] diversion. There are cases that go in the other direction.
>
> . . . .
>
> There is some authority for what I'm about to do, and I know there's some authority contrary to it, . . . . The Court is going to hold that the original [plea] agreement can survive the revocation, and that one of the options the Court has is to sentence the [D]efendant in accordance with the original [plea] agreement, which the Court did accept at the time. So the Court will at this

-4-

point . . . resentence the [D]efendant on this kidnapping charge, case 89776, to ten years in the custody of the Tennessee Department of Correction. . . .

The trial court ordered that the Defendant's ten-year sentence would be served on "enhanced" supervised probation. A judgment of conviction was entered on October 31, 2013. On November 27, 2013, the Defendant filed a notice of appeal.

While his original appeal was pending, the Defendant's probation officer filed an affidavit alleging that the Defendant had violated the terms of his probation, specifically that the Defendant had "absconded from supervision" and failed to comply with further probation requirements. On March 14, 2014, the trial court revoked the Defendant's probation and ordered him to serve the remainder of his ten-year sentence in incarceration in accordance with the October 31, 2013 judgment. The Defendant filed a timely notice of appeal on March 18, 2014. This Court consolidated the Defendant's November 27, 2013 and March 18, 2014 appeals.

## II. Analysis

The Defendant argues on appeal that: (1) the trial court abused its discretion when it revoked the Defendant's judicial diversion and then denied his request for reinstatement to judicial diversion because the Defendant's violation "occurred after [the Defendant's] family physician prescribed attention deficit medication that exacerbated [the Defendant's] untreated bipolar disorder;" (2) the trial court erred when it failed to sentence the Defendant to the minimum three-year sentence for a Range I offender convicted of a Class C felony; and (3) the trial court abused its discretion when it revoked the Defendant's supervised probation sentence and ordered him to serve the remainder of his sentence in incarceration "because of non-criminal violations due to mental illness before [the Defendant] had the opportunity to obtain treatment and medication." The Defendant states that should this Court affirm the trial court's revocation of his judicial diversion, we should modify the Defendant's sentence.

The State responds that the trial court properly revoked the Defendant's judicial diversion because "substantial evidence" established that the Defendant violated the conditions of his judicial diversion. The State concedes, however, that the trial court erred when it imposed the probationary sentence pursuant to the guilty plea agreement without considering the principles and purposes of sentencing in a sentencing hearing. The State asserts that this Court should remand this case to the trial court for a proper sentencing hearing.

### A. Revocation of Judicial Diversion

In Tennessee, if a defendant has been granted judicial diversion, and violates the terms of the diversionary probation, then the trial court should follow the same procedures as those used for ordinary probation revocations. *Alder v. State*, 108 S.W.3d 263, 266 (Tenn. Crim. App. 2002). Those procedures include issuing a probation revocation warrant and conducting a hearing, where the trial court will determine by a preponderance of the evidence whether the defendant in fact violated the probationary terms. *Id.*; T.C.A. § 40-35-311 (2014). This Court summarized the procedural posture and standard of review entailed in a judicial diversion revocation as follows:

> Obviously, for a defendant granted judicial diversion, it is in his best interest to remain on judicial diversion until he successfully completes his period of probation.

> If a defendant placed on judicial diversion violates the terms of his probation, however, the State may seek revocation. *See Alder v. State*, 108 S.W.3d 263, 266 (Tenn. Crim. App. 2002). In addressing the State's allegations, "the trial court should follow the same procedures as those used for ordinary probation revocations." *Id.* If the trial court determines [by a preponderance of the evidence] that the defendant violated the terms of his judicial diversion, "the court *may* enter an adjudication of guilt and proceed as otherwise provided." Tenn. Code Ann. § 40-35-313(a)(2) (emphasis added).

> The General Assembly's use of the permissive term "may" indicates that a trial court retains the discretion to leave the defendant on judicial diversion, even after it finds that the defendant violated the terms of his diversionary probation. *Cf. State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999) (holding that, "at the conclusion of a probation revocation hearing, a trial court can: (1) order incarceration; (2) cause execution of the judgment as it was originally entered; or (3) extend the remaining probationary period for a period not to exceed two years").

> We review a trial court's decision to revoke judicial diversion for an abuse of discretion. *Johnson*, 15 S.W.3d at 517-18; *State v. Doyle W. Pugh*, No. E2000-02488-CCA-R3-CD, 2001 WL 920227, at *2 (Tenn. Crim. App. Aug. 15, 2001). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

*State v. Brys Andrew Hensley*, No. E2012-00812-CCA-R3-CD, 2013 WL 793579, at *2-3 (Tenn. Crim. App., at Knoxville, March 4, 2013) *no perm. app. filed*.

The State notes that the Defendant stipulated to a violation of his judicial diversion. Our review of the record indicates that the Defendant did "submit to the violation" at the March 1, 2013 hearing. In a subsequent hearing, a witnesses testified that, while the Defendant was on judicial diversion, he got into an argument with a woman inside a moving vehicle. He turned around from the front passenger seat and proceeded to strangle the woman, pinning her up against the back seat. She testified that she struggled to breathe while his hands were around her neck and physical evidence of her injuries was presented to the trial court. Following the incident, the woman's father confronted the Defendant, and the Defendant responded by pushing him to the ground. The victim and the Defendant's girlfriend testified that he had been drinking. As a result, the Defendant was arrested and charged with public intoxication, assault, and aggravated assault, and he later pleaded guilty to two counts of simple assault and public intoxication.

In considering whether to revoke the Defendant's judicial diversion, the trial court stated that it took into account the Defendant's "weak amenability to correction," and it found that judicial diversion "did not work" for the Defendant. The trial court noted that it considered the deterrence value of allowing the Defendant to remain on judicial diversion and the interest of the public. The evidence that the Defendant committed assault against two people while on judicial diversion for kidnapping supports the trial court's decision to revoke the Defendant's judicial diversion. Based upon this evidence, we conclude that the trial court did not abuse its discretion when it revoked the Defendant's judicial diversion. We turn now to address the issue of sentencing.

### B. Probation Sentence

The Defendant contends that the trial court erred when it sentenced him to a ten-year sentence and ordered that he serve his sentence on supervised probation. The Defendant argues that his original plea agreement was "defunct" because by law it did not "survive termination of [judicial] diversion[.]" The State agrees, and contends that we should remand this matter to the trial court for a proper sentencing hearing.

The trial court in this case, following its revocation of the Defendant's judicial diversion, held a hearing during which it held that "the original plea agreement can survive the revocation" and sentenced the Defendant "in accordance with the original agreement[.]" This Court held in 2005 that "to allow the State and the defendant to enter into a sentencing agreement prior to termination of diversion contradicts the purpose of the diversion statute, which is deferral of the sentence until a future date." *State v. Judkins*, 185 S.W.3d 422, 425

(Tenn. Crim. App. 2005). The Court in *Judkins* specifically concluded that, "our Sentencing Act never contemplated that a contingency type of plea agreement would be attached to the diversion, which would usurp the sentencing authority of the trial judge following a termination of diversion." *Id.* Thus, the *Judkins* Court remanded the case to the trial court for a sentencing hearing and for the trial court's determination of the appropriate sentence in light of the purposes and principles of the Sentencing Act.

Our review of the record reveals that the trial court impermissibly relied upon the plea agreement in a manner inconsistent with the purposes of the Sentencing Act. Accordingly, we conclude that the trial court erred when it ordered the Defendant to serve the sentence contemplated by the initial plea agreement rather than proceeding through the sentencing process following the revocation of the Defendant's judicial diversion. As such, we remand this case to the trial court for a sentencing hearing, at which the Defendant should be sentenced for kidnapping, a Class C felony, within the appropriate range.

Our holding that the trial court did not properly sentence the Defendant pretermits our consideration of the additional issues regarding the Defendant's sentence.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the trial court did not abuse its discretion when it revoked the Defendant's judicial diversion and we affirm the trial court's judgment in that regard. We vacate the ten-year sentence imposed by the trial court and remand the case to the trial court for a sentencing hearing to determine an appropriate sentence. Upon remand, the Defendant is to be sentenced for kidnapping, a Class C felony, within the appropriate range.

_____
ROBERT W. WEDEMEYER, JUDGE